**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ASHLEY SULLEN, ON BEHALF OF C.J. AND C.S.** | **CIVIL ACTION** |
| **VERSUS** | **NO: 24-01376** |
| **SUSAN HUTSON, ET AL.** | **SECTION: "H"** |

## ORDER AND REASONS

Before the Court is the Motion to Dismiss filed by Orleans Parish Sheriff Susan Hutson, in her individual and official capacities, and Colonel Silas A. Phipps, Jr., in his individual and official capacities as "Compliance Director of the Orleans Parish Sheriff's Office" (collectively, "Defendants") (Doc. 24). For the reasons set forth herein, the Motion is **GRANTED.** Plaintiff's Eighth Amendment claims are **DISMISSED WITH PREJUDICE.** All remaining claims are **DISMISSED WITHOUT PREJUDICE.** Plaintiff shall have **TWENTY (20) DAYS,** or until **THURSDAY, SEPTEMBER 10, 2026,** to amend the Complaint to cure the deficiencies identified herein. Failure to timely amend will result in dismissal without notice.

## BACKGROUND

This is a wrongful death and survival action filed by Plaintiff Ashley Sullen, on behalf of her minor children, C.J. and C.S., the surviving children of Christopher Lee Johnson. Johnson died of a drug overdose at the age of twenty-four while awaiting trial in custody at the Orleans Parish Justice

Center ("OJC").[1] Plaintiff alleges that on or about January 13, 2023, Johnson was arrested and booked into the custody of Orleans Parish Sheriff's Office ("OPSO") at OJC. Plaintiff further alleges that on or about May 26, 2023, "someone introduced illegal drugs into the tier" where Johnson was held.[2] Thereafter, Johnson was transported to University Medical Center ("UMC"), where he was pronounced dead on May 28, 2023. The coroner later determined that Johnson had "overdosed on multiple drugs."[3]

On May 28, 2024, Plaintiff filed a Complaint naming Susan Hutson, in her individual and official capacities as Sheriff of Orleans Parish,[4] and Col. Silas A. Phipps, Jr., in his individual and official capacities as "OPSO Compliance Director."[5] Plaintiff challenges the conditions of confinement at OJC and alleges claims against Defendants pursuant to 42 U.S.C. § 1983. Plaintiff also asserts claims under Louisiana state law.

---

[1] Doc. 1 at 7.

[2] *Id.* at 5.

[3] *Id.* at 7.

[4] The Court notes that Michelle M. Woodfork replaced Susan Hutson as Sheriff of Orleans Parish on May 4, 2026.

[5] Doc. 25 at 10. The parties agree, however, that Col. Phipps's position should be properly identified as "Director of the Compliance & Accountability Bureau (CAB)," which is within the OPSO. For background, OJC has been operating under a federal consent judgment since 2013, as established in *Jones v. Gusman*, E.D. La. No. 12-cv-00859 (Africk, J.) (hereinafter "Jones"). On September 15, 2016, the Court approved the appointment of an independent Compliance Director over OPSO. *See Jones*, Doc. 1097. Defendants state that "[t]he Compliance Director acts as a court-appointed receiver," as outlined in a Stipulated Order entered on June 21, 2016. Doc. 24-2 at 2 n.2 (citing *Jones*, Doc. 1082). Since 2020, "no independent Compliance Director that has been re-appointed by the Court, though the *Jones* Stipulated Order remains in effect." *Id.* Col. Phipps, on the other hand, "is the Director of the Compliance & Accountability Bureau (CAB) within OPSO, which was created in response to *Jones* and functions as an internal oversight body to ensure that the requirements of the Stipulated Order are met—he is not a Court-appointed Compliance Director." *Id.* Plaintiff contends that "[t]his difference in titles is insignificant," and that "[r]egardless of the exact title, Phipps's responsibilities for ensuring compliance with the *Jones* consent decree are the key facts, and his supervisory authority over OPSO's compliance efforts is not contested." Doc. 25 at 10.

On November 18, 2024, this Court issued an Order staying this action in response to now-dismissed Defendant Wellpath, LLC's notice of filing bankruptcy.[6] In that Order, Defendants' pending motion to dismiss was deferred with instructions that Defendants refile the motion to dismiss once the stay was lifted. After the bankruptcy stay was lifted, on March 5, 2026, Defendants refiled their Motion to Dismiss, which is now before the Court.[7] Defendants seek dismissal of all claims against them on grounds of qualified immunity and discretionary immunity under state law. Plaintiff opposes.[8]

## LEGAL STANDARD

### I. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim for relief that is plausible on its face."[9] A claim is "plausible on its face" when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[11] The court need not, however, accept as true legal conclusions couched as factual allegations.[12] To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[13] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" will

[6] Doc. 14.
[7] Doc. 24.
[8] Doc. 25.
[9] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)).
[10] *Id.*
[11] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).
[12] *Iqbal*, 556 U.S. at 678.
[13] *Id.*

not suffice.[14] If it is apparent from the face of the complaint that an insurmountable bar to relief exists and the plaintiff is not entitled to relief, the court must dismiss the claim.[15] The court's review is limited to the complaint, any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint,[16] as well as matters of which a court may take judicial notice.[17]

## II. Qualified Immunity

Defendants' Motion raises the defense of qualified immunity, which "protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."[18] "When a defendant asserts qualified immunity, the plaintiff bears the burden of pleading facts that demonstrate liability and defeat immunity."[19] "The plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"[20] Although "[c]ourts retain flexibility as to which step of the two-step process they consider first," the "better approach to resolving cases in which the defense of qualified immunity is raised" is often "to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all."[21]

"If 'the pleadings are insufficient to overcome [qualified immunity], the district court must grant the motion to dismiss without the benefit of

[14] *Id.*
[15] *Lormand*, 565 F.3d at 255–57.
[16] Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498–99 (5th Cir. 2000).
[17] Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011).
[18] Cope v. Cogdill, 3 F.4th 198, 204 (5th Cir. 2021) ("Cope I").
[19] Shaw v. Villanueva, 918 F.3d 414, 416–17 (5th Cir. 2019) (citing Zapata v. Melson, 750 F.3d 481, 485 (5th Cir. 2014).
[20] *Id.* at 417 (quoting Whitley v. Hanna, 726 F.3d 631, 638 (5th Cir. 2013)).
[21] *Cope I*, 3 F.4th at 204 (citation modified).

pre-dismissal discovery.'"[22] "Similarly, 'where the pleadings are sufficient to overcome [qualified immunity], the district court must deny the motion to dismiss without the benefit of pre-dismissal discovery.'"[23]

## LAW AND ANALYSIS

Defendants argue that Plaintiff fails to plausibly allege a violation of Johnson's constitutional rights against them in either their personal or official capacities under § 1983. Defendants further assert that they are entitled to (1) qualified immunity as to the § 1983 individual capacity claims and (2) discretionary immunity under Louisiana Revised Statutes § 9:2798.1 as to Plaintiff's state-law claims. The Court addresses each argument in turn.

### I. Background Law: 42 U.S.C. § 1983 and Pretrial Detainees

Section 1983 provides a cause of action against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."[24] Because § 1983 does not create substantive rights, "an underlying constitutional or statutory violation is a predicate to liability."[25]

Generally, while the State has "recognized interests in detaining defendants for trial and in punishing those who have been adjudged guilty of a crime," this power "brings with it a responsibility under the U.S. Constitution

---

[22] Borchgrevink v. Harris County, No. 4:23-CV-03198, 2025 WL 2774777, at *2 (S.D. Tex. Sept. 30, 2025) (alterations in original) (quoting Carswell v. Camp, 54 F.4th 307, 312 (5th Cir. 2022)).
[23] *Id.* (alterations in original) (quoting *Carswell*, 54 F.4th at 312).
[24] 42 U.S.C. § 1983.
[25] Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997).

to tend to essentials of their well-being."[26] In *DeShaney v. Winnebago*, the Supreme Court explained the rationale for this principle:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.[27]

Because "pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of 'basic human needs.'"[28] More specifically, jailers have a constitutional duty to protect prisoners and pretrial detainees "from harm inside their facility—whether that be harm from known suicidal tendencies, harm from fellow inmates, or harm from medical conditions."[29]

"Pretrial detainees and convicted prisoners, however, look to different constitutional provisions for their respective rights to basic needs such as medical care and safety."[30] The constitutional rights of convicted state prisoners flow predominantly from the Eighth Amendment's prohibition on cruel and unusual punishment, while the rights of pretrial detainees "descend from the procedural and substantive due process guarantees embedded in the

---

[26] Hare v. City of Corinth, 74 F.3d 633, 638–39 (5th Cir. 1996).
[27] *Id.* at 639 (quoting DeShaney v. Winnebago Cty. Dep't of Social Servs., 489 U.S. 189, 200 (1989)).
[28] *Id.*
[29] Bradley v. Rusk County, No. 2-cv-586, 2025 WL 2946086, at *12 (E.D. Tex. July 21, 2025) (citing *Hare*, 74 F.3d at 650).
[30] *Hare*, 74 F.3d at 650.

Fourteenth Amendment."[31] Convicted felons and pretrial detainees are distinguished on the basis that the State may punish those convicted of crimes—short of imposing cruel and unusual punishment—but cannot punish a pretrial detainee, who has not been convicted of any crime.[32] "Since the State *does* punish convicted prisoners, but *cannot* punish pretrial detainees, a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"[33] Here, while Plaintiff's Complaint invokes the Eighth and Fourteenth Amendments, Plaintiff concedes that Johnson's claims arise under the Fourteenth Amendment. Plaintiff's Eighth Amendment claims are therefore dismissed with prejudice.

In *Bell v. Wolfish*, the Supreme Court set the standard for assessing a pretrial detainee's constitutional challenge to a condition of confinement, holding that "the proper inquiry is whether those conditions amount to punishment of the detainee."[34] "Absent a showing of an expressed intent to punish on the part of detention facility officials," a court may infer that the purpose of a governmental action amounts to unconstitutional punishment where the "restriction or condition is not reasonably related to a legitimate goal," that is, "if it is arbitrary or purposeless."[35]

In *Hare v. City of Corinth*, the Fifth Circuit clarified the extent to which the *Bell* test applies when a pretrial detainee asserts a deprivation of a constitutional right held in common with convicted prisoners, "albeit through a different textual source."[36] The court held that the applicable legal standard

---

[31] Baqer v. St. Tammany Parish Gov't, No. 20-980, 2025 WL 948167, at *5 (E.D. La. Mar. 28, 2025) (citing Est. of Henson v. Wichita County, 795 F.3d 456, 462 (5th Cir. 2015)).
[32] *See id.*; *see also Hare*, 74 F.3d at 639 (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).
[33] *Hare*, 74 F.3d at 639 (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).
[34] 441 U.S. 520, 535 (1979).
[35] *Id.* at 538–39.
[36] *Hare*, 74 F.3d at 640.

for evaluating a pretrial detainee's Fourteenth Amendment due process claims depends on whether the detainee is challenging: (1) a condition of confinement or (2) an individual state official's episodic act or omission.[37] "Cases of the former are attacks on general conditions, practices, rules, or restrictions of pretrial confinement," while in the latter cases, "the complained-of harm is a particular act or omission of one or more officials."[38]

To succeed on a conditions-of-confinement claim, a plaintiff must show (1) a condition; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of the detainee's constitutional rights.[39] "'If the plaintiff has properly stated a claim as an attack on conditions of confinement, he is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish' because intent can be inferred from the unconstitutional condition."[40]

By contrast, an episodic-acts-or-omissions claim requires a showing that "the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference."[41] Even so, "a proper application of *Bell*'s reasonable-relationship test is functionally equivalent to a deliberate indifference inquiry."[42]

---

[37] *Henson*, 795 F.3d at 462 (citing *Hare*, 74 F.3d at 644–45).
[38] Garza v. City of Donna, 922 F.3d 626, 632 (5th Cir. 2019) (citation modified).
[39] *See Henson*, 795 F.3d at 468.
[40] Peña Arita v. United States, 470 F. Supp. 3d 663, 711 (S.D. Tex. 2020) (quoting Shepherd v. Dallas County, 591 F.3d 445, 452 (5th Cir. 2009)); *see also Borchgrevink*, 2025 WL 2774777, at *3 (S.D. Tex. Sept. 30, 2025).
[41] *Cope I*, 3 F.4th at 207.
[42] *Hare*, 74 F.3d at 643. The *Hare* court further explained that "[t]here is no middle ground, no realm in which a prison or jail officer's disregard of a risk of a serious harm is punishment but not cruel and unusual." *Id.* at 650. Judge Dennis, however, identified an apparent tension in the majority's reasoning:"[t]he Supreme Court's decisions repeatedly indicate that convicted inmates have less protections and rights than pretrial detainees and other unconvicted persons in the state's custody" and "[c]ertainly, the ambit of the state's duty to protect pretrial detainees from any punishment is greater than that of its duty to protect convicted inmates only from cruel or unusual punishment." *Id.* at 653 (Dennis, J., concurring).

Defendants argue that this Court should apply the episodic-acts-or-omissions framework. Plaintiff counters that this is "clearly a conditions-of-confinement case" because the Complaint does not allege "that a single deputy's isolated mistake caused Johnson's death."[43] Although generally speaking, "courts determine which theory applies based on an assessment of the facts alleged,"[44] a plaintiff may plead both theories in the alternative, and courts may properly evaluate each separately.[45] Because the Complaint appears to challenge general conditions at OJC as well as various episodic acts, the Court will assess Plaintiff's claims under both frameworks. And regardless, as explained below, the Court finds that the Complaint fails to state a claim under either theory.

## II. Individual Capacity Claims Under § 1983

Because § 1983 does not permit supervisory liability on a theory of respondeat superior, each Defendant may be held liable in his or her individual

---

[43] Doc. 25 at 7. Although Plaintiff does not maintain that this is an episodic case, Plaintiff asserts, without further explanation, that the Supreme Court's objective standard for excessive force claims brought by pretrial detainees in *Kingsley v. Hendrickson* should apply to all claims brought by a pretrial detainee, regardless of whether those claims are episodic- or conditions-based. 576 U.S. 389, 400–01 (2015) (citing *Ingraham v. Wright*, 430 U.S. 651, 671–72 & n.40 (1977)). The Fifth Circuit, however, has explicitly rejected that argument: "after *Kingsley*, this circuit has continued to apply a subjective deliberate indifference standard in non-excessive-force actions alleging a violation of a pretrial detainee's constitutional rights based on episodic acts or omissions." Cope v. Coleman County (Cope II), No. 23-10414, 2024 WL 3177781, at *5 n.7 (5th Cir. June 26, 2024) (citing Alderson v. Concordia Par. Corr. Facility, 848 F.3d 415, 419 & n.4 (5th Cir. 2017) (per curiam)).

[44] *Cope II*, 2024 WL 3177781, at *5, *8 (citing Sanchez v. Young County, 956 F.3d 785, 792 (5th Cir. 2020) (en banc) ("Sanchez II")).

[45] *Baqer*, 2025 WL 948167, at *5 (citing *Henson*, 795 F.3d at 464); Palmer v. Harris County, No. H-25-2326, 2025 WL 2605406, at *4 (S.D. Tex. Sept. 5, 2025) ("No rule bars a plaintiff from pleading both a conditions-of-confinement claim and an episodic-acts-or-omissions claim." (citing Shepherd v. Dallas County, 591 F.3d 445, 452 n.1 (5th Cir. 2009))); *see also Sanchez II*, 956 F.3d at 796 (noting that although the court found in a prior decision that the plaintiff's episodic-acts-or-omissions claim could not succeed, the court "explicitly remanded for the district court to consider Plaintiffs' conditions-of-confinement claim 'in the first instance'" (quoting Sanchez v. Young County, 866 F.3d 274, 279 (5th Cir. 2017) ("Sanchez I"))).

capacity only for his or her own conduct.[46] To impose individual liability, Plaintiff must therefore show that each Defendant, through his or her "own individual actions, has violated the Constitution."[47]

**A. Conditions-of-Confinement**

Defendants suggest that because each individual defendant must have been "personally involved in the challenged conditions," a claim based on an unconstitutional condition of confinement cannot lie against Defendants in their individual capacities.[48] Courts have found, however, that liability may attach where an official was involved with creating, implementing, maintaining, or failing to correct the challenged condition or practice.[49] Regardless, assuming the requirements for individual liability are satisfied,

[46] Doc. 26 at 2 (citing James v. Texas Collin County, 535 F.3d 365, 373 (5th Cir. 2008)).
[47] *Cope I*, 3 F.4th at 207 n.6 (quoting Iqbal, 556 U.S. at 675).
[48] *See* Brown v. McLane, 807 F. App'x 410, 411 (5th Cir. 2020); Sencial v. Lopinto, No. 23-3054, 2026 WL 1784689 (E.D. La. June 22, 2026).
[49] *See, e.g.*, Johnson v. Gusman, No. 19-13949, 2020 WL 2475809, at *5 (E.D. La. May 13, 2020) (finding that the plaintiff had properly alleged a claim against the sheriff in his individual capacity based on unconstitutional conditions of confinement where the complaint alleged that the sheriff "knew about the risk of harm of those conditions, appreciated the risk of harm they created, and did nothing about them"); Oliver v. Gusman, 611 F. Supp. 3d 290, 300 & n.22 (E.D. La. 2020) (holding same and noting that "[w]hile it is true that there is no vicarious liability under § 1983, the Moving Defendants' argument conflates personal involvement with individual liability, which can be imposed for implementing or failing to correct unconstitutional policies" (citing Alderson v. Concordia Par. Corr. Facility, 848 F.3d 415, 420 (5th Cir. 2017))); *Borchgrevink,* 2025 WL 2774777, at *2 n.4 (allowing claims to proceed but noting that while "the Fifth Circuit has at least suggested that conditions-of-confinement claims are cognizable against individual actors only in their official capacities," it "has also suggested that conditions-of-confinement claims may proceed against defendants in their individual capacity where the defendant is personally involved in the challenged conditions" (first citing Est. of Allison v. Wansley, 524 F. App'x 963, 970 n.4 (5th Cir. 2013); and then citing *Brown*, 807 F. App'x at 411)); Nagle v. Gusman, No. 12-1910, 2016 WL 768588, at *9 (E.D. La. Feb. 26, 2016) (declining to dismiss conditions-of-confinement against the prison's medical director in his individual capacity); *but see* Richard v. Gautreaux, No. 24-419, 2025 WL 2740380, at *8 (M.D. La. Sept. 25, 2025) (finding that conditions-of-confinement claims are not cognizable against individual actors).

the Court finds that Plaintiff has failed to allege an underlying conditions-of-confinement claim.[50]

Defendants contend that the Complaint fails to allege (1) a condition and/or policy that (2) caused Johnson's injury.[51] The Court therefore need not address the second element, that is, whether the condition is reasonably related to a legitimate governmental objective. "A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc."[52] But a formal, written policy is not required.[53] A plaintiff can also point to "an identifiable condition or practice," or a "*de facto* policy, as evidenced by a pattern of acts or omissions sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by jail officials, to prove an intended condition or practice."[54] A pretrial "detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs."[55]

Additionally, the plaintiff must show that "the rule, restriction, custom, or practice was the moving force or actual cause of the violation of the

---

[50] The Complaint generally alleges that Defendants "collectively, established, condoned, ratified, and encouraged customs, policies, patterns, and practices," but does not allege that either Defendant was responsible for any particular custom, policy, pattern, or practice. Doc. 1 at 13.

[51] Defendants maintain that this is not a conditions-of-confinement case, so they do not address the requirements of such a claim. Rather, Defendants lodge their objections as to Plaintiff's *Monell* claim, which are substantially similar. *See Baqer*, 2025 WL 948167, at *12 (noting that the policy and causation elements of a *Monell* claim are effectively the same as those required to allege an underlying conditions-of-confinement claim).

[52] *Borchgrevink*, 2025 WL 2774777, at *2 (quoting *Shepherd*, 591 F.3d at 452).

[53] Doc. 1 at 8.

[54] Montano v. Orange County, 842 F.3d 865, 875 (5th Cir. 2016). "This kind of pattern can be shown with 'the consistent testimony of jail employees' or with reports, affidavits, and other documentary evidence." *Baqer*, 2025 WL 948167, at *7.

[55] *Id.*

detainee's constitutional rights."[56] For purposes of causation, multiple policies may coalesce, that is, they may have a "mutually enforcing effect" that results "in the deprival of *all* pretrial detainees' constitutional rights."[57]

While the Complaint primarily comprises conclusory allegations,[58] it alleges the following specifics:

1. Drugs and other contraband "were routinely present" on the tiers where Johnson was housed;
2. "Inmates' access to contraband was a long-standing problem at facilities under OPSO control";
3. On May 26, 2023, "someone introduced illegal drugs into the tier where [Johnson] was held";
4. "On information and belief, another inmate brought these drugs onto the tier, but it is unclear to the plaintiff how this inmate was able to do that";
5. Alternatively, upon information and belief, one or more of the "medical staff" introduced drugs onto the tier;
6. Unidentified deputies either failed to screen incoming inmates or failed to screen "medical staff";

---

[56] *Palmer*, 2025 WL 2605406, at *4 (citing Cadena v. El Paso County, 946 F.3d 717, 727 (5th Cir. 2020)).

[57] *Cope II*, 2024 WL 3177781, at *8; *see also Baqer*, 2025 WL 948167, at *7 (noting that "confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a 'mutually enforcing effect' that produces the deprivation of a single, identifiable human need" (quoting *Sanchez II,* 956 F.3d at 794–95)).

[58] For example, the Complaint alleges that Defendants were responsible for "[h]iring of inadequately trained persons" and "inadequate training and supervision." Doc. 1 at 14. Plaintiff, however, does not contend in the Opposition that the Complaint alleges such claims. Accordingly, to the extent Plaintiff intends to assert them, the Court considers those claims abandoned. *See* Chavez-Sandoval v. Harris County, No. H-24-3072, 2025 WL 2029931, at *3 (S.D. Tex. July 21, 2025) (considering the plaintiff's claims "based on either the failure to properly observe and monitor detainees or the existence of a culture of violence at the jail" abandoned where the plaintiff did not contend in the opposition that he had alleged such claims).

7. Alternatively, an unidentified officer intentionally permitted drugs on the tier;
8. The tiers in which Johnson was housed "suffered from severe staffing shortages and lack of supervision," that "[s]ecurity staff were routinely absent from the tier for long periods of time, leaving inmates unsupervised," and that "[t]his failure to supervise encouraged and implicitly condoned misconduct by inmates on the tier";
9. Johnson's tier was "supposed to be staffed with one or more security deputies at all times," that on the day Johnson consumed drugs, "one or more of deputies were assigned to monitor" Johnson's tier, that "these deputies failed in their duty to monitor and control the tier," and that "it is believed they were absent from their posts for long periods of time during the day in question";
10. On the day Johnson ingested drugs, staff failed to "monitor the video feed and alert security staff to the problem obviously unfolding on [Johnson]'s tier";
11. Defendants failed to provide adequate medical care, including "medical care for addiction" and "medical care, particularly after ingesting illegal narcotics."[59]

According to Plaintiff, these allegations establish that "OPSO maintained ongoing systemic problems" with "contraband interception," "staffing," and "supervision," and "medical care," which "created an unconstitutional risk of harm to all detainees, including Johnson."[60]

As a preliminary matter, Plaintiff's medical-care theory fails because the Complaint does not allege a single supporting fact. The Complaint identifies

[59] Doc. 1 at 4–8.
[60] Doc. 25 at 7–8.

no policy, custom or practice, or *de facto* policy related to medical care. More fundamentally, it does not give any information regarding what medical care Johnson received, if any, other than that Johnson was transported to UMC. Nor does it allege that Johnson requested or was denied medical care. While Plaintiff maintains that the Complaint establishes a policy of failing to administer medical treatment for addiction, even assuming that was the case, the Complaint does not allege that Johnson was diagnosed with or suffered from addiction. The Complaint therefore fails to plausibly allege the existence of a condition related to medical care that caused his injury.

The Court now addresses Plaintiff's remaining claims based on widespread contraband, staffing, and supervision.

***i. Routine presence of drugs***

Plaintiff's primary argument is that the presence of drugs at OJC constituted an unsafe condition that violated his right to be protected from harm. According to Plaintiff, OPSO violated this right by maintaining a custom or practice of routinely allowing drugs into OJC "through multiple vectors."[61] Defendants argue that because Plaintiff concedes that the manner in which drugs entered the facility on May 26, 2023 (the day Johnson overdosed) is unknown, there is no plausible causal link between any OPSO policy and Johnson's death. Plaintiff counters that the Complaint need not specify precisely how drugs entered the facility to establish either that a policy existed or that it caused Johnson's injury.

While it is true that at this stage, Plaintiff need not prove the facts alleged or specify exactly how drugs entered the facility, "in all cases, 'to get past the pleading stage, a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it

[61] Doc. 25 at 9.

must contain specific facts.'"[62] The Complaint alleges no facts concerning the frequency, duration, or scope of the contraband problem and fails to identify any individuals who may have been involved. Simply alleging that unfettered access *existed*, absent any additional factual detail, is insufficient.[63]

The Complaint further alleges that on May 26, deputies were supposedly responsible for screening inmates and medical personnel to prevent drugs from entering the tier and yet either failed to comply with screening policies or intentionally allowed drugs through. But it follows that any deputy's deviation from an affirmative policy cannot constitute a "condition" at OJC, for purposes of a conditions-of-confinement claim, unless said deviation amounted to a *de facto* policy.[64]

While "specific examples of detainees who suffered [Johnson]'s same fate are not required to satisfy the 'condition or practice' element,"[65] to establish a *de facto* policy based on acts or omissions, a plaintiff must point to prior

---

[62] *Palmer,* 2025 WL 2605406, at *3 (quoting Peña v. City of Rio Grande City, 879 F.3d 613, 622 (5th Cir. 2018)); *see also* Henderson v. Anderson, 463 F. App'x 247, 250 (5th Cir. 2012) (stating same and quoting *Spiller v. Texas City Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)).

[63] *See* Greer v. Braman, No. 1:25-CV-1487, 2026 WL 2089227, at *2 (W.D. Mich. July 21, 2026) (assessing the plaintiff's Eighth Amendment claims based on the decedent-prisoner's overdose and finding that "the allegations in this case fail to plausibly allege facts reflecting unfettered access to deadly drugs inside a prison"); *see also* Caraway v. CoreCivic, 98 F.4th 679 (6th Cir. 2024) (finding that the complaint failed to state a claim under the Eighth Amendment because it did not allege facts supporting the assertion that the plaintiff "faced an excessive risk of harm from unfettered access to drugs"); Miller v. Leblanc, No. 21-00353, 2022 WL 4543186, at *4 (M.D. La. Sept. 28, 2022) (finding insufficient under the Eighth Amendment the complaint's allegations that the defendants had "been unable to curb ongoing drug smuggling by . . . employees," which resulted in "unfettered illicit drug trafficking created a substantial risk of serious harm to Decedent," in part because the complaint did not "state with any level of specificity how many officers have been implicated in the alleged 'drug trade,' whether any such officers investigated for possible drug distribution are also connected to Decedent's drug use, or whether any such officer should have provided Decedent with medical care").

[64] *See Cope II*, 2024 WL 3177781, at *8 ("Because Laws's failure to call EMS violated County policy, it cannot serve as a basis for municipal liability.").

[65] *Montano*, 842 F.3d at 876.

incidents bearing sufficient similarity and specificity to the constitutional violation alleged.[66] The Complaint alleges no prior similar instances involving failures to screen or officer misconduct. Plaintiff points out that the Complaint alleges that "prior to [Johnson]'s death another inmate in OPSO custody overdosed on illegal narcotics and died at OJC."[67] Plaintiff gives no additional details regarding that overdose, but in any event, that allegation alone is insufficient to establish a *de facto* policy because "the unconstitutional confinement conditions must amount to more than *de minimis* violations: '[i]solated examples of illness, injury, or even death, standing alone' cannot establish a constitutional violation."[68]

The Court finds that the Complaint fails to plausibly allege a conditions-of-confinement claim based on the "widespread" presence of drugs.

***ii. Staffing***

The Complaint also fails to allege a conditions-of-confinement claim based on staffing shortages. While the Complaint arguably identifies (albeit with scant factual detail) an affirmative staffing policy, it does not plausibly allege that inadequate staffing was the moving force or actually caused Johnson's injury. "To state the causation element of a conditions-of-confinement claim, the plaintiff must allege facts showing that [the] practice or custom was 'closely related to the ultimate injury' and 'actually caused the

---

[66] *See* Feliz v. El Paso County, 441 F. Supp. 3d 488, 502 (W.D. Tex. Feb. 27, 2020) ("Without identifying any affirmative policy statement, and without any concrete factual allegations regarding the findings of an investigation, the statements of officers, or similar previous incidents to corroborate the existence of a pattern, Plaintiff's conclusory allegation that a policy or custom existed is inadequate"); *Peña Arita*, 470 F. Supp. 3d at 712 (holding that the conditions-of-confinement claim failed because the complaint failed to "allege numerous prior incidences or any pattern of abuses that could establish an official policy or custom").
[67] Doc. 1 at 5.
[68] *Peña Arita*, 470 F. Supp. 3d at 711 (quoting Duvall v. Dallas County, 631 F.3d 203, 208 (5th Cir. 2011)); *see also Shepherd*, 591 F.3d at 454 (recognizing same); *Thompkins*, 828 F.2d at 304 ("We have held . . . that the existence of a constitutionally deficient policy cannot be inferred from a single wrongful act." (citing O'quinn v. Manuel, 773 F.2d 605 (5th Cir. 1985))).

constitutional violation complained of.'"[69] This makes sense because "[i]n many cases, the element of causation distinguishes a conditions-of-confinement claim from an episodic-acts-or-omissions claim."[70] In a conditions case, "the conditions themselves constitute the harm," whereas an episodic claim challenges a particular act of, or omission by, an individual actor.[71] Here, Plaintiff's theory appears to be that adequate staffing would have resulted in continuous tier monitoring, which would have allowed an officer to detect the drug possession/use and intervene before Johnson overdosed. But that causation is simply too attenuated for a conditions-of-confinement claim.

For example, the Fifth Circuit has classified a pretrial detainee's claim that sexual assault resulted from inadequate staffing as episodic, reasoning that "[w]hile inadequate staffing policies created the 'general conditions' that enabled the assault, the plaintiff 'did not suffer from the mere existence of the alleged inadequate staffing, but only from [the jailer]'s specific sexual assaults.'"[72]

On the other hand, in *Cope v. Coleman County*, the Fifth Circuit found that the plaintiffs had plausibly alleged that three unconstitutional county policies caused the decedent-pretrial detainee's suicide, namely: (1) staffing only one jailer on nights and weekends ("Staffing Policy"); (2) instructing jailers not to enter an occupied cell alone and to wait to intervene until help arrives ("Do-Not-Enter Policy"); and (3) maintaining lengthy phone cords in

---

[69] *Chavez-Sandoval*, 2025 WL 2029931, at *4 (quoting Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 310 (5th Cir. 2004)); Spiller v. City of Texas City Police Dep't, 130 F.3d 162, 167 (5th Cir. 1997) (the plaintiff must allege facts showing that "the custom or policy served as the moving force behind the constitutional violation").
[70] *Palmer*, 2025 WL 2605406, at *7 (citing *Henson*, 795 F.3d at 464).
[71] *See Cope II*, 2024 WL 3177781, at *8 (quoting *Sanchez II*, 956 F.3d at 791).
[72] *Feliz*, 441 F. Supp. 3d at 500 (alterations in original) (quoting Scott v. Moore, 114 F.3d 51, 53–54 (5th Cir. 1997)).

jail cells ("Phone Cord Policy").[73] The plaintiffs asserted that the Staffing and Do-Not-Enter Policies created conditions at the jail "under which *no* at-risk detainee experiencing a medical emergency at night or over the weekend can receive immediate attention, and the Phone Cord Policy increases the likelihood of a suicidal detainee experiencing a medical emergency under such conditions."[74] The plaintiffs therefore argued that those three policies had "a 'mutually enforcing effect' resulting in the deprival of *all* pretrial detainees' constitutional rights to adequate medical care and protection from known suicidal tendencies."[75]

The court held that the district court should have also considered the claims in *Cope* under the condition-of-confinement framework because, under the plaintiffs' "theory, as in other conditions cases, the Staffing, Do-Not-Enter, and Phone Cord Policies impose 'durable restraints or impositions on inmates' lives' that transcend a single act or omission by an officer."[76]

By contrast, here, the Complaint does not plausibly allege that staffing shortages led to widespread contraband, materially increased the risk of overdose, or otherwise operated in conjunction with other policies to deprive all inmates of "a single, identifiable, human need."[77] Instead, at best, the Complaint alleges that staffing shortages "implicitly condoned misconduct by

---

[73] *Cope II*, 2024 WL 3177781, at *8.
[74] *Id.* (emphasis added) (quoting *Garza*, 922 F.3d at 633).
[75] *Id.* (quoting *Sanchez II*, 956 F.3d at 791); *see also Shepherd*, 591 F.3d at 453 (holding that a claim alleging constitutionally inadequate medical care due to "poor or non-existent procedures and understaffing of guards and medical personnel" was a conditions claim).
[76] *Cope II*, 2024 WL 3177781, at *9 (quoting *Garza*, 922 F.3d at 633–34). The court ultimately vacated and remanded "for the district court to consider in the first instance whether Plaintiffs have raised a genuine dispute of material fact on their conditions claim." *Id.* at *9 (citing *Sanchez I*, 866 F.3d at 279).
[77] *See Baqer*, 2025 WL 948167, at *7 (quoting *Sanchez II,* 956 F.3d at 794–95); *see also Caraway*, 98 F.4th at 685–86 (finding analogous statements in the complaint insufficient to plausibly allege an Eighth Amendment violation because the complaint failed to "allege facts supporting the conclusion that the defendants' understaffing caused drugs to proliferate at" the prison).

inmates on the tier."[78] Unlike in *Cope*, the alleged staffing shortages do not seem to have "imposed 'durable restraints or impositions on inmates' lives' that transcend a single act or omission by an officer," in the same manner as would "overcrowding, deprivation of phone or mail privileges, the use of disciplinary segregation, or excessive heat."[79] Absent a more plausible causal connection, attempting to shoehorn Plaintiff's generalized staffing allegations into the conditions-of-confinement framework "is an effort to fit a square peg into a round hole."[80]

***iii. Monitoring***

Similarly, the Complaint fails to establish a conditions-of-confinement claim based on OJC's failure to monitor Johnson. Again, the Complaint alleges that individual deputies stepped away from their posts and/or failed to monitor the video feed. But it identifies no written or unwritten custom or practice related to failures to monitor, and it alleges no "pattern of acts or omissions" that were sufficiently extended or pervasive so as to amount to a *de facto* policy. While the Complaint alleges that "security staff were routinely absent from the tier for long periods of time, leaving inmates unsupervised," that too is conclusory. And even assuming a *de facto* policy was established, Plaintiff's monitoring claims still fail on causation grounds for the same reasons as the staffing-based allegations.

***iv. Judicial notice***

Plaintiff attempts to save these otherwise conclusory allegations by relying primarily on *Jones v. Gusman*, wherein another section of this Court entered a consent decree establishing policies and procedures under which OJC has been operating since 2013. Plaintiff argues that the consent decree

---

[78] Doc. 1 at 4.
[79] *Peña Arita*, 470 F. Supp. 3d at 711 (quoting *Garza*, 922 F.3d at 633–34).
[80] *Id.* (quoting *Garza*, 922 F.3d at 633–34).

was entered "specifically due to the systemic, unconstitutional conditions described in the Complaint."[81] Plaintiff therefore requests that the Court take judicial notice of "the public record in *Jones v. Gusman*, No. 12-cv-00859 (E.D. La.), including the consent judgment, compliance reports, and related orders."[82]

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."[83] Plaintiff requests that the Court take judicial notice of the contents of the entire record in *Jones*—which comprises over 1,800 docket entries—but fails to specify which documents the Court should consider. Plaintiff also fails to explain with any level of detail how any particular document supports her claims. The only specific reference to the *Jones* record is Plaintiff's assertion that "the DOJ's investigation, which led to the consent decree, identified 'widespread contraband' *including drugs* as a systemic problem at the facility."[84] The Court could locate two findings letters related to the Department of Justice's investigation: one detailing the findings of an investigation from 2009, and one containing updated findings from 2012. Those documents may indeed be relevant to Plaintiff's claims. But assuming Plaintiff intends to reference them, neither document identifies widespread inmate access to illegal narcotics.[85]

---

[81] Doc. 25 at 2.
[82] *Id.*
[83] FED. R. EVID. 201(b).
[84] Doc. 25 at 5 (emphasis added).
[85] Rather, in 2009, the DOJ advised OJC officials that OJC "should implement, at a minimum," certain measures to ensure adequate safety and supervision, including "[e]stablish a procedure to ensure that inmates do not possess or have access to contraband," although drugs were not specifically identified as a widespread problem. U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Orleans Parish Prison System* 25 (Sept. 11, 2009). The 2012 letter, by contrast, stated that the "volume of weapons in the facility and the level

Additionally, while the Complaint alleges broadly that certain conditions were present at the time Johnson was housed, it does not clearly allege that any specific deficiencies from the DOJ reports—which predate Johnson's death by more than a decade—persisted at that time. This is particularly important where Plaintiff acknowledges that the consent decree was adopted in response to the DOJ's findings. Of course, had the Complaint plausibly alleged that such conditions persisted, it would be unreasonable to presume otherwise, at least at this stage. But in the absence of adequate allegations, the Court cannot presume that they *did*, as it "may not consider new facts alleged for the first time in response to a motion to dismiss when ruling on that motion."[86]

At bottom, Federal Rule of Evidence 201 requires a party requesting judicial notice to supply the Court "with the necessary information."[87] And while the Court can take judicial notice that the *Jones* case exists,[88] it is not obligated to sift through the public record in search of support for Plaintiff's statements.[89] Because Plaintiff fails to produce, meaningfully engage with, or give a single accurate citation to, any portion of the *Jones* record, the Court denies Plaintiff's request to take judicial notice of the entirety of its contents.

---

of violence reflect failures in procedures to prevent weapons from coming into OPP and in basic procedures, including sufficient shakedowns, to detect them and remove them from circulation." U.S. Dep't of Justice, Civil Rights Division, *Update to Findings, Orleans Parish Prison System* 8 (Apr. 23, 2012).

[86] *Chavez-Sandoval*, 2025 WL 2029931, at *5; *see also* Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008) ("Because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint.")

[87] FED. R. EVID. 201(c)(2); *see also In re* James, 300 B.R. 890, 897 (W.D. Tex. 2003) ("In other words, the invocation of Federal Rule of Evidence 201(d) does not relieve a party of the duty to gather, organize, and present evidence to the court.").

[88] *Oliver*, 611 F. Supp. 3d at 290 (noting that "[t]he Court may consider documents from the *Jones v. Gusman* litigation in deciding the instant motions because they are part of the public record.")

[89] *See* Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998) (stating that "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition").

### B. Episodic-Acts-Or-Omissions

Plaintiff's claims fare no better under the episodic-acts-or-omissions framework. To succeed on such a claim, a plaintiff must show that each Defendant was "personally involved in the constitutional violation or that there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation."[90] Further, when "a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the proper inquiry is whether the official had a culpable state of mind in acting or failing to act."[91] "An official 'violates a pretrial detainee's constitutional right to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detainee and responded to that risk with deliberate indifference.'"[92]

The Complaint fails to plausibly allege that either Sheriff Hutson or Col. Phipps acted with a culpable mindset. "The deliberate indifference standard is a high one."[93] It "requires more than negligence or oversight"—a plaintiff "must establish that the officers . . . were aware of a substantial and significant risk . . . but effectively disregarded it."[94] "The state actor's actual knowledge is critical to the inquiry—a failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, does not rise to the level of deliberate indifference."[95] For example, "in the context of inmate suicide, to defeat qualified immunity, the plaintiffs must establish that the officers were aware of a substantial and significant risk that the detainee

---

[90] *Borchgrevink*, 2025 WL 2774777, at *5 (quoting Brown v. Taylor, 911 F.3d 235, 245 (5th Cir. 2018)).
[91] *Cope I*, 3 F.4th at 206.
[92] *Id.* at 206–07 (quoting *Henson*, 795 F.3d at 464).
[93] Doe v. Ferguson, 128 F.4th 727, 735 (5th Cir. 2025).
[94] *Peña Arita*, 470 F. Supp. 3d at 710 (quoting Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388, 395 (5th Cir. 2000)).
[95] *Doe*, 128 F.4th at 735.

might kill himself, but effectively disregarded it."[96] A "wanton disregard" for a pretrial detainee's "serious medical needs," such as where officials ignore a detainee's request for medical care or refuse him treatment, can also establish deliberate indifference.[97]

The Complaint alleges claims against Defendants collectively, so it is unclear who is responsible for any decision. Regardless, the Complaint fails to allege that each Defendant was aware of a substantial risk of serious harm to Johnson. The Complaint alleges no facts indicating that either Sheriff Hutson or Col. Phipps personally interacted with Johnson or were otherwise aware of anything specific about Johnson at all. And it fails to allege that any unidentified deputy who failed to screen Johnson or monitor him acted with deliberate indifference—much less allege that Sheriff Hutson or Col. Phipps are liable in their supervisory capacities for that deputy's conduct.[98] "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates."[99]

Rather, the Complaint alleges that Defendants were collectively aware of problems regarding widespread contraband, staffing, and supervision, and yet failed to fix those problems. Subjective knowledge may be inferred in

---

[96] *Cope I*, 3 F.4th at 206–07 (citation modified).
[97] *Id.* (quoting Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)). While Plaintiff argues that addiction is a "serious medical need," that does not save Plaintiff's claims because again the Complaint does not allege that Johnson was an addict or that he requested or was denied treatment for addiction. And to the extent the Complaint alleges that prison officials failed to provide adequate medical care to Johnson after he ingested drugs, those claims would fail for the reasons explained above.
[98] To the extent one could infer deliberate indifference in intentionally allowing drugs into OJC, the Complaint likewise fails to allege supervisory liability.
[99] *Borchgrevink*, 2025 WL 2774777, at *5 (quoting Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011)).

certain circumstances, such as where the relevant risk was "obvious," or where it was "longstanding, pervasive, well-documented, or expressly noted by jail officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it."[100] But "[f]or the court to accept an allegation about a defendant's subjective state-of-mind, the allegation must do more than merely restate the standard required to demonstrate the requisite subjective knowledge."[101] The Court "must carefully discern factual allegations from legal conclusions" in Plaintiff's Complaint.[102]

The Complaint's allegation that "all defendants were aware" that inmates had access to narcotics and that staffing was inadequate "is a legal conclusion that merely 'restates the standard required to demonstrate the requisite subjective knowledge,'" which is insufficient to allege an episodic-acts-or-omissions claim.[103] The sole specific allegation from which the Court could plausibly infer subjective knowledge is the Complaint's assertion that "[n]umerous investigations, letters, reports and lawsuits have documented the unconstitutional conditions faced by inmates in OPSO custody," but the Complaint does not specifically identify any of those documents.[104] While Plaintiff contends that Defendants had a "demonstrated awareness of systemic problems at OJC, as documented in the *Jones* proceedings," as explained above, absent a specific reference to those documents, the Court need not address that argument.[105] Likewise, the Complaint alleges only that one prior

[100] *Cope II*, 2024 WL 3177781, at *6–7.
[101] *Doe*, 128 F.4th at 735 (citation modified).
[102] *See id.* (citation modified).
[103] *See id.* (quoting Edmiston v. Borrego, 75 F.4th 551, 560 (5th Cir. 2026)).
[104] Doc. 1 at 7.
[105] Doc. 25 at 11. Furthermore, the Fifth Circuit has held that, at least at summary judgment stage, reports that are too attenuated in time, are not sufficiently numerous, and/or occur at places outside of the specific area are insufficient to prove subjective knowledge, reasoning

overdose occurred. The Complaint therefore does not allege either (1) sufficiently specific information that was communicated to Hutson or Phipps and from which they could infer a substantial risk of serious harm from drug use, or (2) circumstances so obvious that subjective knowledge may reasonably be inferred.

The Complaint alleges, at most, that unidentified officials negligently failed in their duties to screen for drugs and monitor inmates on the day that Johnson overdosed. Courts have recognized that "subjecting detainees to . . . understaffing is not, by itself, a constitutional violation."[106] Nor is a singular "failure to detect drugs smuggled into the prison."[107] Plaintiff therefore fails to plausibly allege an episodic-acts-or-omissions claim against either Sheriff Hutson or Col. Phipps.

## III. Official Capacity (*Monell*) Claims Under § 1983

Defendants seek dismissal of Plaintiff's § 1983 claims against them in their official capacities, which are treated as claims against the municipality.[108] Municipalities are not entitled to qualified immunity,[109] and as established in *Monell v. Department of Social Services of City of New York*, a municipality may be sued directly under § 1983.[110] A municipality, however, may not be held liable for a constitutional violation under the theory of

---

that "just because information is available to a defendant does not mean he has been exposed to it." *Cope II*, 2024 WL 3177781, at *7 (citation modified).

[106] *Chavez-Sandoval*, 2025 WL 2029931, at *6 (citing Rhodes v. Chapman, 452 U.S. 337, 349 (1981)).

[107] *See* Williams v. Jefferson Parish, No. 22-3971, 2026 WL 817263, at *2 (E.D. La. Mar. 25, 2026), appeal docketed, No. 26-30232 (5th Cir. Apr. 24, 2026) (dismissing the plaintiff's Eighth Amendment claims based on inadequate medical care, in part because "[t]here is nothing in the record to indicate that the prison guards failed to take reasonable measures to ensure prisoner safety").

[108] Kentucky v. Graham, 473 U.S. 159, 166 (1985).

[109] Est. of Sorrells v. City of Dallas, 192 F.R.D. 203, 210 (N.D. Tex. 2000) (collecting cases).

[110] 436 U.S. 658 (1978).

*respondeat superior*.[111] "[A] municipality may be held liable for a constitutional violation if the plaintiff can show (1) there is an official policy or custom, (2) the policymaker had actual or constructive knowledge of the policy or custom, and (3) the policy or custom is the moving force behind the constitutional violation."[112] Stated another way, "[t]o impose 'liability on a defendant in his official capacity, and thus hold a municipality accountable for the constitutional violation, the detainee 'must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with *objective* deliberate indifference to the detainee's constitutional rights.'"[113]

The Complaint alleges that Defendants were "policymakers" for purposes of the *Monell* claim. "The identification of policymaking officials is a question of state law."[114] "Louisiana law provides that the sheriff is the final policymaker for a parish jail."[115] While it is unclear whether Col. Phipps is also a policymaker, Defendants do not raise that issue.[116] Regardless, the Court need not address it because Plaintiff's claims fail under *Monell* for the same reasons as the individual liability claims.

To establish *Monell* liability, there must be "an underlying constitutional violation."[117] Because the Court has concluded that the Complaint fails to plausibly allege an underlying constitutional violation under either theory,

---

[111] *Id.* at 691.
[112] *Baqer*, 2025 WL 948167, at *11 (citing *Cope II*, 2024 WL 3177781, at *3); *see also* Valle v. City of Houston, 613 F.3d 536, 541–42 (5th Cir. 2010); Pudas v. St. Tammany Par., No. CV 18-10052, 2019 WL 2410939, at *3 (E.D. La. June 7, 2019).
[113] *Nagle*, 2016 WL 768588, at *5 (quoting Scott v. Moore, 114 F.3d 51, 53 (1997)).
[114] *Oliver*, 611 F. Supp. 3d at 302 (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988)).
[115] *Id.* (citing LA. REV. STAT. § 13:5539).
[116] *Id.* at 303 n.25 (finding that the sheriff was the policymaker or that alternatively, both the court-appointed compliance director and the sheriff were final policymakers).
[117] *Cope II*, 2024 WL 3177781, at *3.

Plaintiff likewise cannot establish municipal liability. The deficiencies identified in the conditions-of-confinement analysis—failure to plausibly plead a pervasive custom and failure to plausibly plead causation—also preclude *Monell* liability. Indeed, "[t]here is 'no meaningful difference between' a plaintiff's showing an official policy or widespread custom under *Monell* and in showing a sufficiently pervasive condition or practice in a conditions of confinement claim," and "the standard of causation appears to be the same: the policy or custom must have been 'the moving force behind the violation."[118] Dismissal of Plaintiff's official capacity claims is therefore warranted.

## IV. Voluntary Conduct

Although the Court finds dismissal proper because Plaintiff fails to allege the elements of a § 1983 claim, the Court addresses Defendants' alternative argument that Johnson's voluntary consumption of drugs necessarily precludes a constitutional claim.

Defendants rely principally on *Legate v. Livingston* and *Miller v. LeBlanc*.[119] In *Legate*, a prisoner contracted Hepatitis C after participating in a sanctioned, religious communal pipe-smoking ceremony during his incarceration.[120] The Fifth Circuit considered whether the prison's failure to protect him from that risk violated the Eighth Amendment.[121] As a matter of first impression, the court joined other circuits in holding that "the Eighth Amendment does not address injury caused by an inmate's voluntary acts of this nature."[122]

---

[118] *Baqer*, 2025 WL 948167, at *12 (first quoting Duvall v. Dallas County, 631 F.3d 203, 208 (5th Cir. 2011); then quoting Est. of Bonilla by and through Bonilla v. Orange County, 982 F.3d 298, 308 (5th Cir. 2020)).
[119] Legate v. Livingston, 822 F.3d 209 (5th Cir. 2016); Miller v. Leblanc, No. 21-00353, 2023 WL 6368126 (M.D. La. Sept. 28, 2023).
[120] *Legate*, 822 F.3d at 209.
[121] *Id.*
[122] *Id.* at 211.

In *Miller*, the District Court for the Middle District of Louisiana applied *Legate* to an Eighth Amendment claim arising from a prisoner's fatal drug overdose.[123] The plaintiff alleged that prison officials failed to protect the decedent from "unfettered drug trafficking by corrupt prison personnel."[124] Although the court recognized that such allegations could otherwise support an Eighth Amendment failure-to-protect claim, it held that the decedent's voluntary consumption of the drugs constituted an intervening, superseding cause that "broke the causal link" between the alleged drug-trafficking conditions and his death.[125]

Defendants urge the Court to apply *Miller*'s reasoning here, arguing that Johnson's voluntary ingestion of narcotics constituted an intervening, superseding cause. Plaintiff responds that *Miller* and *Legate* are inapplicable because they involved claims brought by convicted prisoners under the Eighth Amendment. Plaintiff further argues that Johnson's ingestion was a foreseeable consequence of the alleged conditions and therefore cannot constitute an intervening, superseding cause.[126]

Starting with Plaintiff's second argument, Plaintiff is correct to the extent that *Legate* does not establish that Johnson's "voluntary consumption" of drugs is an intervening, superseding cause. But this is so because *Legate*

---

[123] *Miller*, 2023 WL 6368126, at *1.
[124] *Id.* at *5.
[125] *Id.* (citing *Legate*, 822 F.3d at 210). The *Miller* court also cited Fifth Circuit precedent discussing the "superseding cause doctrine." *Id.* (citing Williams v. Hampton, 797 F.3d 276, 298 (5th Cir. 2015)).
[126] Plaintiff also argues that Johnson's alleged addiction rendered his conduct involuntary. The Court need not address that argument, however, because the Complaint never alleges that Johnson was an addict. Nevertheless, the Court notes that at least one court has applied *Legate* even where it was undisputed that the decedent-detainee was an addict. *See, e.g.*, Marler v. Wood, No. 22-2460, 2026 WL 1165785, at *2 (W.D. La. June 1, 2026), *appeal docketed*, No. 26-30323 (5th Cir. June 1, 2026) (applying *Legate* and dismissing pretrial detainee's Fourteenth Amendment claims because it was undisputed that the detainee "voluntarily ingested the fentanyl that killed him," and that the detainee had a "substance abuse problem").

was not resolved on causation grounds. There, the issue was whether the Eighth Amendment's duty to protect extended under those facts. The court began from the principle that "[a]n official's duty to protect against such unsafe conditions arises where the inmate has been placed under a regime that incapacitates him to exercise ordinary responsibility for his own welfare."[127] It emphasized that under Supreme Court precedent, a court assesses not only whether "the alleged deprivation posed a 'substantial risk of serious harm' and the defendant acted or failed to act with deliberate indifference," but also asks "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk."[128] Because the plaintiff was not required to participate in the communal-pipe ceremony and did not allege that his incarceration prevented him from exercising ordinary responsibility for his own welfare, the court concluded that the Eighth Amendment did not protect him from the consequences of that voluntary conduct.[129]

Addressing Plaintiff's first argument, *Miller* and *Legate* are nevertheless relevant—and they are not necessarily inapplicable because they concerned Eighth Amendment claims. "That pretrial detainees may have more protections or rights in general, however, does not mean that they are entitled to greater protection of rights shared in common with convicted inmates."[130]

On the other hand, *Legate* does not establish that an incarcerated person's voluntary conduct *necessarily* places the resulting injury beyond constitutional protection. "Unquestionably, the right to reasonable safety encompasses 'protection against unsafe conditions that pose an unreasonable

[127] *Legate*, 822 F.3d at 210.
[128] *Id.*
[129] *Id.*
[130] *Hare*, 74 F.3d at 649. *But see Kingsley*, 576 U.S. at 400 (declining to apply Eighth Amendment standard to excessive force claim brought under the Fourteenth Amendment).

risk of serious damage to the inmate's future health.'"[131] For example, the Fifth Circuit has expressly recognized that "pretrial detainees have a constitutional right to protection from self-harm."[132] That right may give rise to a conditions-of-confinement claim based on suicide or an episodic-act claim against officials who are deliberately indifferent to a known risk of suicide.[133] As *Hare* explains, "[t]he State's obligation to prevent suicide may implicate a kaleidoscope of related duties, including a duty to provide not only medical care, but also protection from self-inflicted harm."[134]

The Sixth Circuit's decision in *Zakora v. Chrisman*, which involved claims arising under the Eighth Amendment, illustrates this point.[135] There, the court expressly rejected the proposition that "an inmate who suffers a drug overdose will . . . automatically lose a failure-to-protect claim simply because he voluntarily ingested the drugs."[136] Instead, the court held that "[s]uch a claim is cognizable if the inmate alleges, and ultimately establishes, that he was at serious risk of injury from the presence of drugs before the injury occurred."[137] The court reasoned that the danger associated with drugs is magnified in the controlled environment of a prison[138] and concluded that

---

131 *Miller*, 2023 WL 6368126, at *5 (quoting *Legate*, 822 F.3d at 210).
132 Alexander v. Philip R. Taft Psy D & Assoc., P.L.L.C., 165 F.4th 309, 322 (5th Cir. 2025), *petition for cert. filed*, No. 25-1128 (U.S. Mar. 23, 2026).
133 *See Cope II*, 2024 WL 3177781; *Sanchez II*, 956 F.3d at 791.
134 *Hare*, 74 F.3d at 644.
135 44 F.4th 452 (6th Cir. 2022), *cert. denied*, No. 22-614, 143 S. Ct. 2608 (June 12, 2023) (Mem.).
136 *Id.* at 471.
137 *Id.*
138 *Id.* at 470 (noting that "[a]ccording to the Bureau of Justice Statistics, incarcerated individuals are about 12 times more likely to exhibit drug dependence or misuse than the general population," and that "[o]verdose fatalities in prisons have indeed climbed dramatically in recent years" (first citing Jennifer Bronson, et al., U.S. Dep't of Just., Bureau of Just. Stat., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates*, 2007-2009, at 3–4 (2017), https://www.bjs.gov/content/pub/pdf/dudaspji0709.pdf; and then citing E. Ann Carson, U.S. Dep't of Just., Bureau of Just. Stat., *Mortality in State and Federal Prisons*, 2001-2018, at 6 (2021), https://bjs.ojp.gov/content/pub/pdf/msfp0118st.pdf)).

"unfettered access to deadly drugs inside a prison" can constitute a sufficiently serious risk of harm.[139] The court also recognized that a categorical voluntary-conduct rule would be in tension with precedent recognizing constitutional claims arising from suicide.[140]

*Zakora* ultimately concluded that in incarcerating the plaintiff, the State "consequently assumed a responsibility to provide for his reasonable safety, which meant not allowing him unfettered access to deadly narcotics."[141] The court relied on the Supreme Court's decision in *Farmer v. Brennan*, wherein the Court emphasized that "[h]aving incarcerated persons with demonstrated proclivities for criminally antisocial and, in many cases, violent conduct, and having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."[142] So if "prison officials are aware that a prisoner has access to dangerous substances, they are 'not free to let the state of nature take its course' by standing by and allowing further harm to ensue."[143]

Importantly, *Zakora* did not hold that the presence of drugs in a correctional facility necessarily creates an unconstitutional condition. To the contrary, it emphasized that "simple exposure to drugs, without more, does not violate contemporary standards of decency" and that prison officials need not prevent all drugs from entering a facility.[144] The constitutional significance

---

[139] *Id.* at 470–74.
[140] *See id.* at 471.
[141] *Id.* at 471–72.
[142] 511 U.S. 825, 833 (1994).
[143] *Zakora*, 44 F.4th at 474 (quoting *Farmer*, 511 U.S. at 833). And again, a plaintiff need not necessarily demonstrate such awareness to state a claim based on an allegedly unconstitutional condition of confinement, because the intent to punish can be inferred from the condition. *See Shepherd*, 591 F.3d at 452.
[144] *Zakora*, 44 F.4th at 472.

arose from the alleged "unfettered access" to deadly narcotics, supported by the officials' failure to promptly investigate two prior overdoses in the decedent's unit.[145]

While district courts outside of this jurisdiction have since adopted *Zakora's* reasoning,[146] a few within this Circuit, including other sections of this Court, have applied *Legate* in dismissing claims based on overdoses where there was no dispute that the plaintiff's consumption of drugs was voluntary.[147] This Court finds *Zakora*'s reasoning persuasive. *Legate* teaches that the constitutional duty to protect does not necessarily extend to risks voluntarily assumed by an inmate who remains capable of exercising ordinary responsibility for his own welfare. But it does not establish that voluntary conduct categorically defeats a constitutional claim regardless of the nature of the risk or the circumstances of confinement. Indeed, *Legate* itself framed the inquiry by reference to whether society would tolerate exposing a person unwillingly to the complained-of risk. And *Zakora* explains why unfettered access to deadly narcotics in a correctional facility may present a materially different constitutional question from the optional communal-pipe ceremony at issue in *Legate*.

[145] *See id.*

[146] *See, e.g.*, *Caraway*, 98 F.4th at 684–86 (distinguishing the facts before it from *Zakora*); *Greer*, 2026 WL 2089227, at *2–3 (assessing claims under *Zakora* and *Caraway*); Est. of Esquival by and through Montalvan v. Williams, No. 1:24-cv-02213, 2025 WL 3687390, at *1 & n.1 (D. Colo. Dec. 19, 2025) (applying *Zakora* and rejecting the argument that *Legate* foreclosed the plaintiff's claims because the decedent's ingestion of contraband constituted "voluntary conduct").

[147] *See, e.g.*, *Marler*, 2026 WL 1165785, at *2 (finding no constitutional violation because, among other things, the plaintiff had voluntarily consumed narcotics); *Williams*, 2026 WL 817263, at *2 (holding same and stating that "[t]here is no dispute that [the inmate] willingly ingested the drugs that led to his overdose. He cannot claim that the mere fact that drugs were smuggled into the prison somehow incapacitated him from exercising 'ordinary responsibility for his own welfare.'"); Miss. v. Rinehart, No. 15-77, 2016 WL 4703516, at *6 (N.D. Miss. Sept. 7, 2016) (finding no constitutional violation where "the Decedent is alleged to have voluntarily participated in the ingestion of drugs based on his lifelong poly-substance abuse").

In sum, the Court holds only that *Legate* does not establish the categorical bar Defendants seek—that Johnson's alleged voluntary consumption of narcotics necessarily forecloses Plaintiff's constitutional claims. Because those claims are otherwise inadequately pleaded for the reasons discussed above, the Court need not determine what allegations *would be* sufficient to bring an overdose claim outside *Legate*'s voluntary-conduct principle.

Plaintiff requests leave to amend in the event the Court finds that dismissal is warranted. Federal Rule of Civil Procedure 15 provides that "the Court should freely give leave when justice so requires,"[148] but the Court may deny leave to amend in certain circumstances, such as where amendment would be futile.[149] Here, the Court finds that amendment would not be futile as to all of Plaintiff's § 1983 claims. The Court therefore grants Plaintiff's request to amend the Complaint to cure the deficiencies described herein. In amending the Complaint, the Court cautions that if Plaintiff intends to rely on factual findings in public reports, Plaintiff should identify those findings with specificity and explain how those findings support Plaintiff's claims.

## V. State Law Claims

Finally, Defendants seek dismissal of Plaintiff's claims under Louisiana law. Defendants do not argue that the underlying elements of those claims are not satisfied but rather assert that Louisiana's discretionary immunity statute applies.[150]

Louisiana Revised Statutes § 9:2798.1 provides that:

> Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to

---

[148] FED. R. CIV. P. 15(a)(2).
[149] *See* Mandujano v. City of Pharr, 786 F. App'x 434, 438 (5th Cir. 2019).
[150] Defendants also do not argue that this Court should decline to exercise supplemental jurisdiction over these claims in the event that Plaintiff's § 1983 claims are dismissed.

> exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.[151]

This immunity, however, does not apply "(1) [t]o acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or (2) [t]o acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct."[152]

"Discretionary immunity under La. R.S. 9:2798.1 is an affirmative defense and, as such, the party raising it bears the initial burden of demonstrating its applicability."[153] If the defendant establishes entitlement to immunity, the burden shifts to the plaintiff to show there is conduct that would except the defendant from liability.[154] Louisiana law provides that "[i]mmunity statutes are strictly construed against the party claiming immunity."[155]

Defendants contend that they are entitled to immunity because Plaintiff's claims "are based on alleged failures in supervision, monitoring, and implementation of policies related to inmate safety and contraband interdiction at OJC," which are "quintessentially discretionary functions."[156] Plaintiff does not dispute that assertion but contends that the second exception applies because Defendants engaged in criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct within the meaning of La. R.S. 9:2798.1(C). Plaintiff relies primarily on the Complaint's

---

[151] LA. REV. STAT. § 9:2798.1(B).
[152] *Id.* at (C).
[153] Megan Rose v. City of Monroe, No. 23-cv-865, 2026 WL 2110430, at *8 (E.D. La. June 23, 2026) (citing Dominique v. St. Tammany Parish, 313 So. 3d 307, 314 (La. App. 2020)).
[154] *Id.* (citing *Dominique*, 313 So. 3d at 314 n.6).
[155] *Id.* (citing *Dominique*, 313 So. 3d at 314).
[156] Doc. 24-2 at 16.

assertion that "Defendants acted 'recklessly,' 'willfully,' 'wantonly,' and with 'deliberate indifference,'" contending that those statements must be accepted as true.[157] Again, those allegations are conclusory.

Plaintiff further argues that "[t]he Complaint states that the Defendants continued to maintain constitutionally deficient conditions despite the existence of the *Jones* consent decree and its compliance requirements," but that statement appears nowhere in the Complaint, and the Court will not consider the *Jones* record at this time for the reasons explained above. Plaintiff also suggests that the requisite intent may be inferred from the single prior overdose death and "widespread contraband" problem. But again, those allegations remain conclusory. Because Plaintiff fails to show that an exception to Louisiana's discretionary immunity applies, dismissal of Plaintiff's state law claims is warranted. The Court, however, will grant leave to amend because it finds that amendment would not be futile.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 24) is **GRANTED**. Plaintiff's Eighth Amendment claims are **DISMISSED WITH PREJUDICE**. All remaining claims are **DISMISSED WITHOUT PREJUDICE**. Plaintiff shall have **TWENTY (20) DAYS**, or until **THURSDAY, SEPTEMBER 10, 2026**, to amend the Complaint to cure the deficiencies identified herein. Failure to timely amend will result in dismissal without notice.

---

[157] Doc. 25 at 13. Further, because Plaintiff does not argue that Defendants engaged in "acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists," the Court will not consider the applicability of that exception. *See* LA. REV. STAT. § 9:2798.1 (C)(1)).

New Orleans, Louisiana, this 21st day of August, 2026.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**